IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>IVAN JAMES, KAI JAMES, JOH WILLIAMS, MALACHI BENJAMIN, TILLISA CEASER, JAHKIEBO JOSEPH, and ARIEL PETERSON,<br><br>Defendants. | Case No. 3:19-CR-79 |

## UNITED STATES' OPPOSITION TO THE MOTION TO DISMISS COUNTS FIVE THROUGH TEN

The United States of America, through Delia L. Smith, United States Attorney for the District of the Virgin Islands, and the undersigned Assistant United States Attorney, hereby files this opposition to the motion to dismiss counts five through ten of the Second Superseding Indictment (ECF No. 353).

### I.   PROCEDURAL HISTORY

The defendants in this matter are charged in a twenty-three count Second Superseding Indictment. Relevant to the motion at hand, Counts Five through Ten charge Kai James, Jahkiebo Joseph, Ariel Peterson, and others known and unknown to the grand jury, with willfully transporting firearms to another individual, in violation of 18 U.S.C. § 922(a)(5) and 18 U.S.C. § 924(a)(1)(D), and conspiring to do so.

1

Peterson filed a motion to dismiss Counts Five through Ten, alleging that 18 U.S.C. § 922(a)(5) is inconsistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). ECF No. 353. Joseph joined that motion.[1] ECF No. 354.

## II.   DISCUSSION

**A. The Second Amendment and *Bruen*.**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for lawful purposes like self-defense in the home. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628-34.

But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (portion of the opinion reflecting the views of four justices) (repeating *Heller*'s "assurances" that it "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the

---

[1] Another defendant, Ivan James, also moved to join the motion, ECF No. 384, but he is not charged in the relevant counts.

2

mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" (cleaned up)). The Court meant its list of "presumptively lawful regulatory measures only as examples," and the list is not exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a firearm outside his home only by proving that "proper cause exists." *Id.* at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id.* First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134-35. The petitioners—"two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct—"carrying handguns publicly for self-defense"—fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id.* at 2135-56. After a "long journey through the Anglo-American history of public carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American

3

governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

> **B. The Court should hold that the defendants bear the burden of showing that the Second Amendment's plain text implicates the prohibition at issue.**

In *Bruen*, the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a firearm regulation bears that initial burden.

To repeat, the Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of firearm regulation. *See, e.g.*, *id.* at 2126, 2130. At step two, the Court assigned the Government the burden of offering historical evidence to support the regulation. *Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634-35). The Court did not explicitly say which party has the burden at step one. Nor did it need to since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's analogy to the First Amendment's burden-shifting framework, the party challenging a firearm regulation has the burden at step one. Although the Government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment right applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v.*

4

*Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Likewise here, the defendants bear the burden of showing that the Second Amendment applies.

### C. Title 18, United States Code, Section 922(a)(5) is constitutionally sound.

The defendants are charged with transporting firearms, in violation of 18 U.S.C. § 922(a)(5), which provides that:

> [i]t shall be unlawful . . . for any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) to transfer, sell, trade, give, transport, or deliver any firearm to any person (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) who the transferor knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides; except that this paragraph shall not apply to (A) the transfer, transportation, or delivery of a firearm made to carry out a bequest of a firearm to, or an acquisition by intestate succession of a firearm by, a person who is permitted to acquire or possess a firearm under the laws of the State of his residence, and (B) the loan or rental of a firearm to any person for temporary use for lawful sporting purposes[.]

18 U.S.C. § 922(a)(5). "The purpose of the Gun Control Act of 1968, of which § 922(a)(5) is a part, was '* * * to strengthen Federal controls over interstate * * * commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders.'" *United States v. Colicchio*, 470 F.2d 977, 979 (4th Cir. 1972) (quoting House Report No. 1577 to H.R. 17735 (P.L. 90-618), U.S. Code Cong. & Admin. News 1968, p. 4411). And "[a] major purpose of § 922(a)(5) was to regulate practices whereby persons traveled across state lines to obtain guns in states with less restrictive laws." *United States v. Schwab*, 710 F. Supp. 419, 421 (D. Conn. 1989) (citing Senate Report No. 1097, Omnibus Crime Control and Safe Streets Act of 1968, 1968 U.S.Code & Admin. News 2112, 2164–65, 2167).

The defendants' Second Amendment challenge to this statute lacks merit because: (1) their conduct does not fall within the plain text of the Second Amendment; and (2) the statute is consistent with historical regulations on firearms.

1. **The statute does not prohibit activity that is protected by the plain text of the Second Amendment.**

Title 18, United States Code, Section 922(a)(5), merely prohibits transfer of firearms (including transportation of firearms) to residents of other states, unless the transferor or transferee is a federal firearms licensee ("FFL"). Nothing in that statute prohibits an individual from: (1) purchasing a firearm in his state of residence; (2) purchasing a firearm outside his state of residence from an FFL; or (3) transporting a firearm between states, when there is no transfer of the firearm.[2,3]

---

[2] Other statutes and regulations may restrict out-of-state purchases or transportation. *See, e.g.*, 18 U.S.C. § 922(a)(3); 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.99. But those restrictions also do not prevent individuals from obtaining and possessing firearms. *See, e.g.*, 27 C.F.R. § 478.96(c)(1); *Mance v. Sessions*, 896 F.3d 699, 709 (5th Cir. 2018) ("A qualified person in any state may purchase a handgun from an FFL in his or her state of residence, or may purchase the handgun from an out-of-state FFL as long as the weapon is lawfully transferred to an in-state FFL."). In any event, the defendants are not charged with violating those restrictions and those restrictions are not at issue here.

[3] The Government notes that the defendants appear to interpret 18 U.S.C. § 922(a)(5), to foreclose transportation of a lawfully purchased firearm without a transfer. For example, the defendants conjecture that an individual violates 18 U.S.C. § 922(a)(5) if the individual "purchases a firearm from a sporting goods store in one State, then sends it to himself at his second residence in another State," infringing upon that individual's right to possess a firearm. *See* ECF No. 353, at 19.

While, as noted in the previous footnote, other statutes or regulations may restrict that action, Section 922(a)(5) does not prohibit an individual's transportation of firearms between states, without a transfer. *See United States v. James*, 172 F.3d 588, 593 (8th Cir. 1999) ("In section 922(a)(5), Congress created the single offense of transferring (by any one of several different means) a firearm by an unlicensed person to any other unlicensed person who resides in a different state than the state in which the defendant resides."). By its terms, the statute prohibits transportation from "any person" to "any person . . . who the transferor knows or has reasonable cause to believe does not reside in . . . the State in which the transferor resides." 18 U.S.C. § 922(a)(5). A transferor tautologously must reside in the state in which the transferor resides,

Thus, Section 922(a)(5)'s restriction on transfers does not "infringe" on the central right protected by the Second Amendment: the right to armed self-defense. *See* Webster's 1828 American Dictionary of the English Language (defining "infringe" as "[t]o break; to violate; to transgress" and "[t]o destroy or hinder"). *Bruen* reiterated the holdings from *Heller* and *McDonald* that "individual self-defense is the '*central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *Heller* and *McDonald*) (emphasis in original). Section 922(a)(5) does not prevent anyone from obtaining a firearm for self-defense. Simply put, *Bruen* did not extend the Supreme Court's interpretation of the bounds of the Second Amendment to include regulations on transfers that do not meaningfully interfere with any individuals' Second Amendment right to keep or bear arms.

To the contrary, in their concurrence, Justice Kavanaugh and Chief Justice Roberts reaffirmed the Supreme Court's recognition in in *Heller* and *McDonald* that "nothing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626-27, and *McDonald*, 561 U.S. at 786). Justice Alito similarly emphasized that the Court's "holding decides nothing about . . . the requirements that must be met to buy a gun." *Id.* at 2157. Justice Alito's concurrence is especially noteworthy, as he wrote the opinion in *McDonald* in which (in a portion of the opinion joined by three other justices) he made a point to "repeat th[e] assurances" from *Heller* that the Court's rulings did not "cast doubt" on the regulation of "the commercial sale of arms," which the *Heller*

---

rendering the statute inapplicable in that scenario. And the use of the term "transferor" indicates that the statute is addressing a transfer, not mere transportation without transfer.

Moreover, any concerns about transportation without transfer are absent from this case because the defendants are charged in Counts Five through Ten with crimes involving transportation to another individual.

7

Court described as "presumptively lawful regulatory measures." *McDonald*, 561 U.S. at 786 (quoting *Heller*, 554 U.S. at 626-27, 627 n.26).

And in *Bruen* the Court was careful to make clear that it was not holding that any administrative burden on acquiring a firearm infringed on an individual's Second Amendment right to keep and bear arms. Rather, *Bruen* emphasized that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of the "shall-issue" firearm-carry licensing schemes that existed in 43 states. 142 S. Ct. at 2138 n.9. The Court explained that "these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635). And Justice Kavanaugh emphasized in his concurrence (joined by the Chief Justice) that states can constitutionally require license applicants to "undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." *Id.* at 2162 (Kavanaugh, J., concurring). If such administrative burdens on the carrying of firearms are permissible, then § 922(a)(5)'s ban on unlicensed interstate transfers of firearms is similarly constitutional because it does not "deny ordinary citizens their right to public carry." *Id.* at 2138 n.9 (majority opinion). Indeed, it works to prevent the circumvention of valid state firearm laws like the ones discussed in *Bruen*.

Moreover, the Ninth Circuit has held that the right to sell firearms—which is analogous to the right to transfer them—is not protected by the plain text of the Second Amendment. In *Teixeira v. County of Alameda*, the court held *en banc* that "the Second Amendment does not confer a freestanding right to sell firearms." 873 F.3d 670, 682 (9th Cir. 2017) (en banc). *Teixeira* involved a challenge to a zoning law that, among other things, prohibited the sale of firearms in

8

certain areas. *Id.* at 673. In concluding that "the Second Amendment does not independently protect the ability to engage in gun sales," *id.* at 682 n.16, the Ninth Circuit undertook a detailed analysis of the text and intended purpose of the Second Amendment when it was codified, *see id.* at 683-87.

Following the guidance from *Heller*, the court "beg[a]n with [the] text of the Second Amendment," finding that "[n]othing in the specific language of the Amendment suggests that sellers fall within the scope of its protection." *Id.* at 683. The court further found that "[n]o historical authority suggests that the Second Amendment protects an individual's right to *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." *Id.* at 686-87 (emphasis in original). The court concluded that "the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Id.* at 682.

And the Eleventh Circuit has specifically held that 18 U.S.C. § 922(a)(5) does not regulate activity protected by the Second Amendment because it only imposes "conditions and qualifications on the commercial sale of arms"; it "does not operate to completely prohibit . . . anyone . . . from selling or buying firearms" and "only minimally affects the ability to acquire a firearm." *See United States v. Focia*, 869 F.3d 1269, 1286-87 (11th Cir. 2017). [4]

---

[4] The Government notes that the Third Circuit stated, in *dicta* in a footnote, that:

> Commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading. *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of firearms." 128 S.Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

9

Accordingly, the Court should conclude that the defendants' challenge fails at step one because 18 U.S.C. § 922(a)(5) does not prohibit conduct protected by the plain language of the Second Amendment.

**2. Title 18, United States Code, Section § 922(a)(5) is consistent with historical firearm regulation.**

The defendants' challenge also fails at *Bruen*'s historical step because § 922(a)(5) is consistent with the nation's historical tradition of firearm regulation. There have been numerous proscriptions on the sale, transport, and transfer of firearms since the Founding Era. Courts have recognized that "colonial governments substantially controlled the firearms trade." *Teixeira v. City of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). Indeed, that control extended to prohibition on intercolonial transfer of firearms. In the early 17th century, Connecticut banned residents from selling firearms outside the colony. *Teixeira*, 873 F.3d at 685. Virginia likewise provided that

---

*United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). But as, the Ninth Circuit recognized in *Texeira*, its reasoning is not inconsistent with that language from *Marzzarella*:

> Our holding does not conflict with *United States v. Marzzarella*. *Marzzarella* cautioned that if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms." 614 F.3d at 92 n.8. *Marzzarella* rightly observed that in contemporary society, permitting an overall ban on gun sales "would be untenable under *Heller*," *id.*, because a total prohibition would severely limit the ability of citizens to *acquire* firearms. *Marzzarella* did not consider a situation in which the right of citizens to acquire and keep arms was not significantly impaired, yet commercial retailers were claiming an independent right to engage in sales.

*Teixeira*, 873 F.3d at 687-88. This is such a situation—there is no total ban, merely a restriction that no one alleges significantly impaired the right of anyone involved to exercise their Second Amendment right to obtain and retain firearms (beyond the hypothetical transportation without transfer addressed in the previous footnote).

10

people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*." *Id.* at 698 (emphasis added).

Other colonies "controlled the conditions of trade" in firearms. *Id.* at 685. For example, at least six colonies made it a crime (with severe penalties) to sell or provide firearms or ammunition to Native Americans. *Id.* at 685 (citing 17th-century laws from Massachusetts, Connecticut, Maryland, and Virginia); *see also Exhibit* 2, 6 Statutes at Large of Pennsylvania from 1682 to 1801 at 319-320 (1899) (passed in 1763); *Exhibit* 3, Laws and Ordinances of New Netherland, 1638-1674 (1868) at 18-19 (1639 ordinance), 47 (1645 ordinance), 278 (1656 ordinance). Two early states prohibited the sale or transfer of firearms with barrels that had not been proven by an inspector. *Exhibit 4*, Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-61 (1807) (1805 Act); *Exhibit* 5, Laws of the State of Maine 546 (1830) (1821 Act). Further, and consistent with this Founding Era tradition, states continued to enact laws governing the manufacture, sale, and transport of guns and/or gunpowder in the 18th and 19th centuries. *See* Robert Spitzer, *Gun Law History in the United States and the Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 74 (2017).[5]

Turning to gunpowder—which is closely related to firearms—governments restricted the transfer of gunpowder by unlicensed individuals. Indiana, for example, allowed governments to "regulate and license … the keepers of gunpowder and other explosive compounds." *Exhibit 1*, at 17; *see also, e.g.*, *Exhibit 1*, at 20 (Chicago 1851, §§ I and II) ("[N]o person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission … in writing, signed by

---

[5] That commentator also noted that "a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals." Robert Spitzer, 80 Law & Contemp. Probs. at 76 (citing Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128).

11

the mayor and clerk and sealed with the corporate seal" and requiring clerk to "make an entry thereof in a register" to keep track of permitted parties); *Exhibit 1*, at 27 § 3 (Providence, RI, 1821) (prohibiting anyone who "shall keep, have, possesses, or transport" or sell gunpowder without a license). And colonies similarly prohibited the unlicensed intercolonial exportation of gunpowder. *Exhibit 1*, at 22 (Connecticut 1775) (no "gun-powder made and manufactured … shall be exported out of the [Colony] without license"); *Exhibit 1*, at 25 (Massachusetts 1651) ("no person … shall transport any gunpowder out of this jurisdiction, without license first obtained").

This historical perspective shows that the Second Amendment was not offended by laws that limited the transfer of firearms or required a license to do so. Indeed, contrary to the defendants' assertions, historical laws specifically restricted the intercolonial transfer of firearms.

Moreover, as previously noted, in *Heller*, the Supreme Court explained that its decision did not call into question regulations on the "commercial sale of arms." *Heller*, 554 U.S. at 627. This example was included in a laundry list of "longstanding" prohibitions that were to be considered "presumptively valid" because of their historical recognition and vintage. *Id.* at 626.

The defendants nevertheless contend that 18 U.S.C. § 922(a)(5) is not a commercial regulation of firearms. But, to the contrary, 18 U.S.C. § 922(a) is part of a broader scheme of commercial regulation and, moreover, 18 U.S.C. § 922(a)(5) specifically provides that certain transfers of firearms may only be lawfully conducted by FFLs. Thus, 18 U.S.C. § 922(a)(5) is best construed as falling within the category of commercial regulation referenced by the Supreme Court. *Accord Focia*, 869 F.3d at 1286.

In sum, historical sources demonstrate a wide panoply of laws from the Founding Era which regulated the transfer of firearms, including by barring intercolonial firearm transfers. These are historical analogues to the current restrictions placed on non-licensed individuals in 18 U.S.C.

§ 922(a)(5). And 18 U.S.C. § 922(a)(5) is the type of commercial regulation that the Supreme Court has indicated is presumptively constitutional. Therefore, the Court should reject the defendants' arguments.

### III. CONCLUSION

For these reasons, the Government respectfully requests that the Court deny the defendants' motion to dismiss Counts Five through Ten.

Respectfully submitted,

DELIA L. SMITH
UNITED STATES ATTORNEY

Dated: December 30, 2022     By:     *s/ Adam Sleeper*
Adam Sleeper
Appellate Chief
United States Attorney's Office
District of the Virgin Islands
5500 Veteran's Drive, Suite 260
St. Thomas, VI 00802
Office: (340) 774-5757