## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Case No. 19-CR-00079** |
| **IVAN JAMES,**<br>**KAI JAMES,**<br>**JOH WILLIAMS,**<br>**MALACHI BENJAMIN,**<br>**JAHKIEBO JOSEPH, and**<br>**ARIEL PETERSEN,** | |
| **Defendants.** | |

### UNITED STATES' OPPOSITION TO DEFENDANTS'
### MOTION TO LIMIT THE TESTIMONY OF THE GOVERNMENT'S
### PROPOSED EXPERT WITNESSES IN FIREARMS EXAMINATION

The United States of America, through Delia L. Smith, United States Attorney for the District of the Virgin Islands, files this opposition to defendants Ivan James, Joh Williams and Ariel Peterson's Motion to Limit the Testimony of the Government's Proposed Expert Witnesses in Firearms Examination [and] Request for a Daubert Hearing. (ECF No. 589).

## I.    INTRODUCTION

The defendants seeks to: "(1) exclude testimony that the casings and bullets came from any particular firearm at issues in this case; (2) limit the firearms examiner[s] to a discussion of class characteristics;5 (3) and . . . . exclude the comparison photographs that purport to show a match." ECF No. 589, at 4.  Defendants do not dispute that these examiners are eminently qualified in their field. Defendants' challenge is more fundamental than that. The question their motion presents is whether a firearm examiner is ever able to reliably conclude that a bullet or cartridge was fired from a particular gun. The answer to that question is a resounding yes. As demonstrated by study after study, examiners can make correct determinations about the source of a bullet or cartridge

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 2

about 99% of the time or more. This is the primary reason that court after court has concluded that such opinions easily meet the *Daubert* standard for admissibility.

Critics of this field have nitpicked the design of some of the studies that generated those results. But whatever one thought of those criticisms when they were first raised years ago, they are out of date now. That is because, since 2016—when the last of the reports relied on by the defendants were issued—several studies have been released whose design meets all the strict specifications prescribed by the field's critics, and those studies have provided further proof for what firearm examiners have said all along: by examining the markings on bullets and cartridges, they can identify the firearm that fired them with remarkable accuracy.

The United States also submits an expert statement, initially filed in *United States v. Chavez, et. al.,* 3:15-cr-2785 (N.D. Cal.), which speaks to these issues. Todd Weller is a certified firearm examiner and co-author of multiple peer-reviewed journal articles in this field, who has also conducted studies that validate the foundational premises of the field using advanced 3D imaging. The criticisms of this field were overblown from the beginning, and with every new study that is released, those criticisms become weaker. That is why, notwithstanding a few outlier rulings cited by the defense, the overwhelming majority of courts that have addressed this issue have found that the conclusions of firearms examiners are reliable and that their opinions are admissible. The defendant's motion to limit their testimony in this case should therefore be denied.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The United States notified the defendants that it intends to call three firearms examiners to testify regarding this evidence: Kevin Rippman, Major J. Wells, Jr., and Reynold DeSouza. Rippman and Wells are Firearm and Toolmark Examiners with the Bureau of Alcohol, Tobacco,

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 3

Firearms and Explosives. The United States has determined that it will not call DeSouza—who is a Firearms Examiner with the Virgin Islands Police Department—as an expert witness regarding firearms examination, as pertinent to firearms examination. The United States, however, intends to elicit testimony from DeSouza regarding chain of custody. The defendants have moved to limit the firearm examiner testimony. ECF No. 589. The United States opposes that motion.

### III.   LEGAL STANDARD

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). This gatekeeping function requires the judge to assess whether the methodology is scientifically valid and relevant to the facts in issue.[1] *Daubert*, 509 U.S. at 592-93.

### IV.   OVERVIEW OF FIREARMS EXAMINATION

A firearm examiner is trained to observe and classify marks made when a cartridge is fired from a firearm into three types of characteristics during a firearm toolmark examination: class characteristics, sub-characteristics, and individual characteristics. *United States v. Harris*, 502 F. Supp. 3d 28, 34 (D.D.C. 2020); *see also* Committee on Identifying the Needs of the

---

[1] The defense has not challenged the "relevance" of the proposed examiner testimony in its motion, only its "scientific validity."

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 4

Forensic Sciences Community, National Research Council, *Strengthening Forensic Science in the United States: a Path Forward* (2009) at 152, available at https://www.ncjrs.gov/pdffiles1/nij /grants/228091.pdf ("2009 NRC report").[2]

Class characteristics are intentional, objective features that are shared by many items of the same type, such as the weight or caliber of the bullet, and the number, twist, and width of the lands and grooves. *Harris*, 502 F. Supp. 3d at 34; 2009 NRC Report at 152; National Research Council, *Ballistic Imaging* (2008), at 31-34, 46, 55, 58 available at https://nap.nationalacademies.org/catalog/12162/ballistic-imaging ("2008 NRC Report").[3] These characteristics are intentional design features determined prior to the manufacturing of a firearm.

Class characteristics also serve a screening purpose: they eliminate the possibility that a bullet or cartridge case was fired from a particular firearm that does not share the characteristics common to all members of that group. 2008 NRC Report, at 57-58. They do not establish uniqueness and are not used to identify a particular bullet or cartridge's source. *Id*. For example, bullet twist direction is a class characteristic; a bullet with right twist marks can be excluded by that class characteristic as coming from a Colt revolver, which is manufactured to project left twisting bullets. *Id*. at 31. Firearm toolmark examiners are trained and knowledgeable about the class characteristics associated with different manufacturers and firearms.

Individual characteristics are the marks considered unique to an individual firearm. These include fine microscopic markings in the barrel or firing pin such as striations,

---

[2] The 2009 NRC Report is attached to the defendants' motion at ECF No. 589-3.
[3] The 2008 NRC Report is attached to the defendants' motion as ECF No. 589-2.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 5

impressions, and other random imperfections or irregularities, which are transferred or imprinted on a bullet or cartridge case at the time of propulsion. *Harris*, 502 F. Supp. 3d. at 34-35; 2009 NRC Report, at 152; 2008 NRC Report, at 58.

"Sub-class" characteristics are produced incidentally within a small batch of firearms due to imperfections in the manufacturing tool. *Harris*, 502 F. Supp. 3d at 35; 2008 NRC Report, at 58. Sub-class marks are typically dimensionally larger and of a different quality than individual characteristics. James E. Hamby et al., *The Identification of Bullets Fired from 10 Consecutively Rifled 9mm Ruger Pistol Barrels: A Research Project Involving 507 Participants from 20 Countries*, 41 No. 2 Ass'n Firearm and Toolmark Exam'rs J., 99, 104, 107 (2009) ("Hamby Study"). For example, drag from a production tool may produce a wide line cutting across a series of cartridges—a sub-class mark, but one that is distinguishable from the impressions, striations, and other marks created during the firearm propulsion event.

Ultimately, "[t]he task of the firearms and toolmark examiner is to identify the individual characteristics of microscopic toolmarks apart from class and subclass characteristics and then to assess the extent of agreement in individual characteristics in the two sets of toolmarks to permit the identification of an individual tool or firearm." NRC Report, at 153.

The Association of Firearms and Toolmark Examiners (AFTE) is the leading professional organization in the field and publishes standards for ensuring reliability and proficiency. Under the AFTE Theory of Identification ("AFTE Theory"), a qualified examiner can conclude that bullets or casings were fired by the particular firearm by comparatively examining bullets and casings and determining whether "sufficient agreement'" of toolmarks exist. *Harris*, 502 F. Supp. 3d at 35. The methodology of determining when sufficient agreement

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 6

is present is detailed by the Association of Firearm Toolmark Examiners ("AFTE method") and is the field's established standard. *Id*.; *see also Theory of Identification as it Relates to Toolmarks*, AFTE, available at https://afte.org/about-us/what-is-afte/afte-theory-of-identification (last accessed December 6, 2023) (attached as Exhibit 1). Sufficient agreement considers the relative height or depth, width, curvature and special relationship of the individual peaks, ridges and furrows within one set of surface contours as compared to the corresponding features in a second set of surface contours. *See* AFTE Theory of Identification. It is reached when the likelihood that another tool could have made the mark is so remote as to be considered a practical impossibility. *Id*. Although the identification of "sufficient agreement" is subjective in nature, it is founded on scientific principles and is based on the examiner's training and experience. *Id*.

Consistent with the AFTE Theory and with an aim toward standardization, AFTE developed a range of possible conclusions when comparing toolmarks: (1) an "identification" of the components, concluding that they came from the same source; (2) an "elimination" of the components, concluding that they did not come from the same source; (3) "inconclusive," meaning that there is not enough evidence to identify whether the components either do or do not come from the same source; (4) and "unsuitable" for examination. *See Summary of the Examination Method*, AFTE, available at https://afte.org/resources/swggun-ark/summary-of-the-examination-method (last accessed December 6, 2023) (attached as Exhibit 2).

## V.   HISTORY OF CHALLENGES TO FIREARM IDENTIFICATION

Firearms identification has been an established forensic discipline for close to a century, and courtrooms around the world have accepted it as the basis for expert testimony for almost as

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 7

long. *See* Hamby, J. & Thorpe, J., *The History of Firearm and Toolmark Identification*, AFTE Journal 31(3) at 266-84 (Summer 1999). But in recent years, scientists from outside the field have criticized some of the studies that demonstrate the reliability of firearm identification, and defendants have seized on those criticisms to argue for the exclusion (or drastic limitation) of all firearm identification testimony at trial.

This effort has been almost entirely unsuccessful. For many years, a long line of opinions have carefully addressed and thoroughly rejected the challenges to this field.[4] And in the past few years, district court after district court around the country has addressed and rejected all the same arguments made by the defendants here, often after a *Daubert* hearing, declining to limit firearms testimony more than the applicable Department of Justice guidelines[5] for DOJ firearm examiners.[6]

---

[4] *See, e.g., United States v. Diaz*, 05-cr-00167 WHA, 2007 WL 485967 (N.D. Cal. Feb. 12, 2007); *United States v. Ashburn*, 88 F. Supp. 3d 239, 245 (E.D.N.Y. 2015); *United States v. Otero*, 849 F. Supp.2d 425 (D.N.J. 2012); *United States v. Taylor*, 663 F. Supp.2d 1170 (D.N.M. 2009); *United States v. Natson,* 469 F. Supp. 2d 1253, 1261 (M.D. Ga. 2007); *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) ("[T]he matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades.").

[5] *See* Exhibit 3, Department of Justice, Uniform Language for Testimony and Reports for the Forensic Firearms/Toolmarks Discipline – Pattern Matching Examination (Aug. 16, 2023).

[6] *United States v. Pete*, No. 3:22CR48-TKW, 2023 WL 4928523, (N.D. Fla. July 21, 2023); *United States v. Randolph*, No. 8:22-CR-145-TPB-AAS, 2023 WL 4562855 (M.D. Fla. July 17, 2023); *United States v. Blackman*, No. 18-CR-00728, 2023 WL 3440384 (N.D. Ill. May 12, 2023*); United States v. Dunham*, 654 F. Supp. 3d 1183, 1191 (E.D. Okla. 2023); *United States v. Rhodes*, No. 3:19-CR-00333-MC, 2023 WL 196174 (D. Or. Jan. 17, 2023);  *United States v. Lee*, No. 19 C 641, 2022 WL 3586164, at *2 (N.D. Ill. Aug. 22, 2022); *United States v. Chavez*, No. 15-CR-00285-LHK-1, 2021 WL 5882466 (N.D. Cal. Dec. 13, 2021); *United States v. Romero-Lobato*, 379 F. Supp. 3d 1111 (D. Nev. 2019); *United States v. Harris*, 502 F. Supp. 3d 28 (D.D.C. 2020); *United States v. Johnson,* 16-cr-281 PGG, 2019 WL 1130258 (S.D.N.Y. Mar. 11, 2019); *United States v. White*, No. 17-cr-611 RWS, 2018 WL 4565140 (S.D.N.Y. Sept. 24, 2018);  *United States v. Hunt*, 464 F. Supp. 3d 1252 (W.D. Okla. 2020); *United States v. Brown*, 973 F.3d 667, 704 (7th

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 8

Only a very small minority of cases have ever placed any limitations whatsoever on the opinions of qualified experts in this field. David Faigman, et al., 4 Mod. Sci. Evidence § 34:4 (Dec. 2020) ("Regardless of their ostensible tone . . . what the cases *do* tends to be similar, namely, admit the testimony while sometimes placing relatively minor limits on what the testifying expert is permitted to say about the probativeness of his or her identification opinion . . .").

And, significantly, earlier criticisms of the field have been resolved by several recent studies**.** At the center of the defense's challenge are three outdated government reports that touch, to varying degrees, on issues related to firearm identification. The first two are the 2008 and 2009 NRC Reports, both of which emphasized the subjective aspects of the method used by firearm examiners. The third is a 2016 report of the President's Council of Advisors on Science and Technology (PCAST) titled "The Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods" (the "PCAST Report").[7] The PCAST Report canvassed the literature in this area and criticized the design of most of the studies that purported to validate the accuracy of firearm examiners. PCAST Report, at 106.

Notwithstanding those criticisms, the methods used by firearm examiners have sound scientific foundations, and a recently released and carefully documented report from the Department of Justice eviscerates PCAST's criticism of this field.[8] Among other problems, PCAST did not include anyone from the firearm examiner community and therefore

---

Cir. 2020) (affirming *United States v. Chester*, 13-cr-00774, Dkt. 875 (N.D. Ill., Oct. 7, 2016); *United States v. Gil*, 680 F. App'x 11, 13 (2d Cir. 2017).

[7] The 2016 PCAST Report is attached to defendants' motion at ECF No. 589-1.

[8] *See* U.S. Department of Justice Statement on the PCAST Report: *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (January 2021) (available at https://www.justice.gov/olp/page/file/1352496/download) (attached as Exhibit 4).

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 9

misunderstood fundamental aspects of the studies under discussion; the report miscounted or omitted data from several studies; and it included multiple basic mathematical errors. *Id*. Contrary to the conclusions of PCAST, there are in fact numerous studies from before 2016 that demonstrate the validity of firearm identification, several of which are identified below. *See infra* at p. 15-16.

"It is also worth noting that the authors of the three scientific reports explicitly acknowledged that the rigorous, entirely objective, infallible, and certain standards that prevail within a scientific discipline are not necessarily properly applied in a courtroom." *United States v. Johnson*, 16-cr-281 PGG, 2019 WL 1130258, at *13 (S.D.N.Y. Mar. 11, 2019); *see also Ashburn*, 88 F. Supp. 3d at 245; *Otero*, 849 F. Supp.2d at 438. That is just one of the reasons that all three reports were careful to say that they cannot comment on whether this category of evidence should be admissible in a court.[9]

But the Court does not need to wade through a point-by-point rebuttal of the various shortcomings in these reports. That is because, even if their criticisms are accepted, the studies that validate the science of firearm identification have advanced markedly since the release of those reports, such that the field today meets and exceeds the benchmarks set by its critics for scientific validity.

To reach this conclusion, the Court need look no further than the words of Eric Lander, the geneticist who co-chaired PCAST when it issued the 2016 report. In early 2018, Dr. Lander published an article in the Fordham Law Review in which he explained, just as the 2016 PCAST

---

[9] *See, e.g.*, 2008 NRC Report, at 18 ("[W]e do not in any way offer a determination of whether ballistics evidence should or should not be admissible in court proceedings."); 2016 PCAST Report, at 112 ("Whether firearms analysis should be deemed admissible based on current evidence is a decision thatbelongs to the courts.").

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 10

Report did, that "firearms analysis fell just short of the criteria for scientific validity," because it relied, in his view, on only one properly designed study. Eric. S. Lander, *Fixing Rule 702: The PCAST Report and Steps to Ensure Reliability of Forensic Feature Comparison*, 86 Fordham L. Rev. 1661, 1672 (2018). He was referring to the study conducted in 2014 by the Ames Laboratory of the Department of Energy (commonly referred to as "Ames I"),[10] which is identified and described in the 2016 PCAST Report. This Ames I study asked over 200 examiners to make over 2,000 comparisons among various cartridges cases and found that they made incorrect identifications only about 1% of the time. According to Dr. Lander, if one more study reproduced the results of Ames I, which Dr. Lander described as "well-designed," it would render firearms identification "scientifically valid." *Lander*, 86 Fordham L. Rev. at 1672 ("A second study would solve this problem."). This was consistent with the position of the 2016 PCAST Report, which described Ames I as an "appropriately designed" black box study and explained that one more like it would establish "foundational validity," which PCAST defined as "a showing, based on empirical studies, to be repeatable, reproducible, and accurate at levels that have been measured and are appropriate to the intended application." PCAST Report at 4, 109-111.[11]

---

[10] Baldwin, D.P., Bajic, S.J., Morris, M., and D. Zamzow, *A study of false-positive and false-negative error rates in cartridge case comparisons,* Ames Laboratory, USDOE, Technical Report #IS-5207 (2014).

[11] A "black box" study is one that measures the ability of an examiner to reach the correct result, without evaluating the steps the examiner used to get there.  Or, as PCAST put it, black box studies are conducted "*empirically* by seeing how often examiners actually get the right answer." An Addendum to the PCAST Report on Forensic Science in Criminal Courts (January 6, 2017) (available at https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/ pcast forensics_ addendum_finalv2.pdf) (attached as Exhibit 5).

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 11

Since the 2016 PCAST Report, and Dr. Lander's comments in the Fordham Law Review, the field has answered the call for more research. In 2018, a study known as the "Keisler study" was published that adhered to all the testing requirements imposed by PCAST.[12] In the Keisler study, 126 examiners analyzed over 2,500 cartridge cases and did not identify a single false positive or false negative, for an error rate of 0%. And in 2020, the study commonly known as Ames II was released.[13] This study, as the name would suggest, was also conducted by DOE's Ames Laboratory and maintained the design of Ames I. In Ames II, 173 examiners were tested on over 8,000 bullets and cartridges and found to have a false positive error rate of less than 1%. Thus, firearm examination is now "scientifically valid," even under the excessively strict requirements demanded by PCAST.

## VI.  FIREARM IDENTIFICATION SATISFIES THE RELIABILITY REQUIREMENTS OF *DAUBERT*

In *Daubert*, the Supreme Court provided a non-exhaustive list of factors for a court to evaluate when deciding whether to expert testimony is reliable: (1) whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community. *See* 509 U.S. at 593-94. These

---

[12] A. Keisler, et al., "Isolated Pairs Research Study," AFTE Journal, Vol 50 No 1 (Winter) 2018.

[13] Stanley J. Bajic, et al., *Report: Validation Study of the Accuracy, Repeatability, and Reproducibility of Firearms Comparisons*, Oct. 7, 2020, Ames Laboratory-US DOE, Technical Report #ISTR-5220.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 12

factors are not a "definitive checklist or test," and the trial courts have "broad latitude" in assessing the reliability of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 150 (1999). The Third Circuit has identified additional factors which should be considered: (1)" the relationship of the technique to methods which have been established to be reliable"; (2) "the qualifications of the expert witness testifying based on the methodology"; and (3) "the non-judicial uses to which the method has been put." *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 & n.8 (3d Cir. 1994).

In setting forth its non-exhaustive list of factors, the *Daubert* Court also recognized that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Applying these principles, courts have long held that firearms identification testimony was admissible.

### A. Firearm identification can be and has been tested.

The first *Daubert* factor asks whether firearms identification is testable and has been tested. There is no dispute that this methodology has been tested on countless occasions. A 2007 article in the *Journal of Forensic Sciences* highlights some of the past research and illustrates how the profession has studied, characterized, and shared their findings. Nichols, R., *Defending the Scientific Foundations of the Firearms and Tool Mark Identification Discipline: Responding to Recent Challenges*, Journal of Forensic Sciences, Vol 52(3) (May 2007) at 590-94. In addition, as noted above, several robust tests of the reliability of firearm identification have been conducted in recent years—including Ames I, Ames II, and the Keisler study—which meet all the standards for study design set forth by the field's critics.

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 13

No one can reasonably deny that the theory has been tested. For this reason, courts who consider this issue have no trouble concluding that this element of the *Daubert* standard is satisfied. *See United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1118 (D. Nev. 2019) (stating with respect to testing, "[t]here is little doubt that the AFTE method of identifying firearms satisfies this *Daubert* element."); *Johnson*, 2019 WL 1130258 (S.D.N.Y. 2019), at *15 ("There appears to be little dispute that toolmark identification is testable as a general matter."); *United States v. Diaz*, 2007 WL 485967 at *5 (N.D. Cal. 2007) (holding that the theory of firearms identification, though based on examiners' subjective assessment of individual characteristics, "has been and continues to be tested"); *United States v. Ashburn*, 88 F. Supp. 3d 239, 245 (E.D.N.Y. 2015) ("The AFTE methodology has been repeatedly tested."); *United States v. Otero*, 849 F. Supp.2d 425, 433 (D.N.J. 2012) ("The literature in the field of firearms and toolmark identification documents that the theory has been repeatedly tested.").

### B. Firearm Identification has been subjected to peer review.

The second *Daubert* factor asks whether the theory has been published in a peer reviewed journal. Peer review can be valuable because it exposes a theory to critical scrutiny by a neutral third party, which "increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593. The fact that a scientific theory has been published in a peer reviewed journal is therefore a "relevant, though not dispositive" factor in assessing its scientific validity. *Id*. The field of firearm examination has been thoroughly vetted by numerous individuals, including those affiliated and unaffiliated with the field, and therefore easily satisfies this *Daubert* element.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 14

The defense focuses its "peer review" argument on the AFTE Journal. ECF No. 589, at 25-26. But almost every court to consider the issue has concluded that the AFTE Journal satisfies this *Daubert* element. *See, e.g., United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1119 (D. Nev. 2019) ("Several published federal decisions have also commented on the *AFTE Journal*, with all finding that it meets the *Daubert* peer review element."); *United States v. Shipp*, 422 F. Supp. 3d 962 (S.D.N.Y. 2019) ("Despite AFTE Journal's open peer-review process, the AFTE Theory has still been subjected to significant scrutiny."); *United States v. Harris*, 502 F. Supp. 3d 28, 40 (D.D.C. 2020) ("publication in the AFTE Journal satisfies this prong of the *Daubert* admissibility analysis" as "numerous courts have concluded").

Moreover, the AFTE Journal is far from the only source of peer review in this field. It is undisputed that other journals have published articles validating the science in this field. For example, in recent years, multiple studies assessing the foundational validity of firearm examination evidence have been filed in other peer-reviewed scientific journals. *See United States v. Harris*, 502 F. Supp. 3d 28, 40 (D.D.C. 2020) ("Even if the Court were to discount the numerous peer-reviewed studies published in the AFTE Journal, Mr. Weller's affidavit also cites to 47 other scientific studies in the field of firearm and toolmark identification that have been published in eleven other peer-reviewed scientific journals.").

Moreover, the peer review process is not limited to academic journals. The 2016 PCAST Report constitutes rigorous peer review. *United States v. Romero-Lobato*, 379 F. Supp. 3d 1111, 1119 (D. Nev. 2019) ("[O]f course, the NAS and PCAST Reports themselves constitute peer review despite the unfavorable view the two reports have of the AFTE method."); *Shipp*, 422 F. Supp. at 777 (same). PCAST's meta-analysis of the existing research in the field was far more

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 15

wide-ranging than what would be expected by a neutral reviewer at an academic journal. The extensive scrutiny to which firearm examination has been subjected establishes that this *Daubert* factor favors admissibility.

### C.    Firearm identification has a very low error rate.

The third *Daubert* factor instructs the court to consider the theory's rate of error. Firearm identification has a long history of rigorously studying the accuracy of its methodology. Again and again, those studies have demonstrated that trained firearm examiners can take spent bullets or cartridges and correctly associate them with the gun that fired them with error rates at or below 1%. Here is a sampling of just some of the studies in this area, with the corresponding error rate:

| STUDY | ERROR RATE |
|---|---|
| Brundage, D.J., *The Identification of Consecutively Rifled Gun Barrels*, AFTEJ 30(3) (Summer 1998) at 440. | 0% |
| DeFrance and Van Arsdale, *Validation study of electrochemical rifling*, AFTEJ 35(1) (Winter 2003) at 36. | 0% |
| Smith, E., *Cartridge case and bullet comparison validation study with firearms submitted in casework*, AFTEJ 37(2) (2005) at 132. | 0% |

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 16

| | |
|---|---|
| Hamby, J.E., Brundage, D.J., and J.W. Thorpe, *The identification of bullets fired from 10 consecutively rifled 9mm Ruger pistol barrels: a research project involving 507 participants from 20 countries*, AFTE Journal, Vol. 41, No. 2 (2009): pp. 99-110. | 0% |
| Mayland B., Tucker C., *Validation of Obturation Marks in Consecutively Reamed Chambers*, AFTEJ 44(2) (Spring 2012) at 167-169. | 1.6%<br><br>One examiner (out of 64) reported three false identifications, and the remaining 63 examiners reported no false identifications. |
| Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati, *An Empirical Study to Improve the Scientific Foundation of Forensic Firearm and Tool Mark Identification Utilizing 10 Consecutively Manufactured Slides*, AFTEJ 45(4) (Fall 2013) at 385-87. | 0.064% for Phase 1<br><br>0.18% for Phase 2 |
| Fadul, T.G., Hernandez, G.A., Stoiloff, S., and S. Gulati, *An empirical study to improve the scientific foundation of forensic firearm and tool mark identification utilizing consecutively manufactured Glock EBIS barrels with the same EBIS pattern*, National Institute of Justice Grant #2010-DN-BX-K269 (2013) at 33. | .7% (with a maximum error rate of 1.2% with 95% certainty) |
| Stroman, A., *Empirically Determined Frequency of Error in Cartridge Case Examinations Using a Declared Double Blind Format*, AFTEJ 46(2) (Spring 2014) at 157-175. | 0% |
| Smith, Smith, Snipes, J.B., *A Validation Study of The Bullet and Cartridge Case Comparisons Using Samples Representative of Actual Casework*, Journal of Forensic Sciences (2016) at 5. | .144% (false positive error rate; overall error rate was .303%, including false negatives) |

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 17

These studies all share basic design features that were criticized by the 2016 PCAST Report, such as the use of a "set-based" rather than "pairwise" design. For various reasons explained in the DOJ rebuttal to the PCAST Report, the government does not agree that this design feature undermines the validity of these studies. But the field of firearm identification no longer needs to rely on studies such as these to demonstrate its scientific validity, as the field has now completed several black box studies that follow the strict design specifications prescribed by its critics.

The 2016 PCAST Report supports a "pairwise" study design, in which an examiner is given one or two bullets or cartridges that have been fired from one firearm (the "knowns"), as well as another bullet or cartridge that may or may not have been fired from that same firearm (the "unknown"). The examiner is then asked to determine whether, in comparison with the "knowns," the "unknown" is a match, not a match, or the markings are too indistinct to make a call—i.e., "inconclusive."

As noted above, three such "pairwise" studies have now been completed—Ames I, the Keisler study, and Ames II—and the error rates they measured are extraordinarily low. Those studies describe the frequency with which an examiner incorrectly matched a bullet or cartridge as the "false positive rate," and the frequency with which the examiner incorrectly eliminated the bullet or cartridge as a potential match as the "false negative rate." The proper focus is on false positives because "in the courtroom the rate of false negatives is immaterial to the *Daubert* admissibility of latent fingerprint identification offered to prove positive identification because it is not probative of the reliability of the testimony *for the purpose for which it is offered* (i.e., for

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 18

its ability to effect a positive identification)." *United States v. Mitchell*, 365 F.3d 215, 240 (3d Cir. 2004) (addressing fingerprint examination).

In any event, both categories of error are reported in this table and they are both very low:

| STUDY | ERROR RATE |
|---|---|
| ***Ames I***<br><br>Baldwin, Bajic, Morris, and Zamzow, *A study of false-positive and false-negative error rates in cartridge case comparisons,* Ames Laboratory, USDOE, Technical Report #IS-5207 (2014). | False Positive Rate<br>    1.01%<br><br>False Negative Rate<br>    0.367% |
| ***Keisler***<br><br>Mark A. Keisler, et al., "Isolated Pairs Research Study," AFTE Journal, Vol 50 No 1 (Winter) 2018 at 56-58. | False Positive Rate<br>    0%<br><br>False Negative Rate<br>    0% |
| ***Ames II***<br><br>Bajic, Chumbley, Morris, and Zamzow, *Report: Validation Study of the Accuracy, Repeatability, and Reproducibility of Firearms Comparisons*, Ames Laboratory-US DOE, Technical Report #ISTR-5220 (2020). | False Positive Rate<br>    0.704% for cartridges<br>    0.92% for bullets<br><br>False Negative Rate<br>    2.92% for cartridges<br>    1.76% bullets |

Low as these error rates are, the error rate in fieldwork is likely to be far lower. These studies were designed to be more difficult than fieldwork in several respects, including the relatively small number of samples for comparison, as well as the choice of the study designers in Ames II to use consecutively manufactured firearms made of steel.

But the most important way in which these studies overestimate the frequency of errors is that they lack a second-level review. Every accredited firearm identification laboratory in America, including the ATF laboratories at issue here, have a second examiner who verifies the results of

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 19

the first examiner. *See* Exhibit 6, Weller Decl. ¶ D28. This is likely to drastically decrease the rate of errors that find their way into the courtroom, even if we were to assume that each examiner's error rate is as high as 1%. Then, even those extremely rare errors could be caught and challenged by the defendant's own expert. Because firearms examination is "non-consumptive," the evidence can be tested and re-tested as many times as necessary, with an unlimited number of opportunities to catch errors.

Notably, the 2016 PCAST Report opined that, from a scientific perspective, an acceptable error rate should be less than 5%. PCAST Report at 152. The measured error rate in the field of firearm identification is far below the threshold permitted for admissibility under *Daubert*, as courts have repeatedly found. *Romero-Lobato*, 379 F. Supp. 3d at 1119 ("[T]he studies cited by . . . other federal courts examining the issue universally report a low error rate for the AFTE method."); *Harris*, 502 F. Supp. 3d at 39 ("Because the evidence shows that error rates for false identifications made by trained examiners is low—even under the PCAST's black-box study requirements—this factor also weighs in favor of admitting Mr. Monturo's expert testimony."); *Ashburn*, 88 F.Supp.3d at 246 ("[T]he error rate, to the extent it can be measured, appears to be low, weighing in favor of admission").[14]

---

[14] The United States notes that the defendants contend that inconclusive results should be removed from the denominator when calculating error rates. But even when inconclusives are removed from the denominator from the black box studies, the false positive rate is well below the 5% standard specified in the 2016 PCAST Report.  The false positive error rate for all comparisons in Ames I, Ames II, Keisler and Chapnick is: 1.0%, 0.7% (bullets) & 0.9% (cartridge cases), 0%, and 0.4%.  The false positive error rate with no inconclusives is: 1.5%, 2.1% (bullets) & 1.9% (cartridge cases), 0%, and 0.7%. Weller Decl. ¶ F2 n.4.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 20

> **D.** **The field of firearm examination is controlled by a set of standards and controls.**

The fourth *Daubert* factor asks whether the field maintains standards controlling the technique's operation. Every accredited lab that performs firearm identification analysis, including the three labs offering evidence in this case, operates under a detailed set of written protocols that dictate every step of their process, from evidence intake to inventory procedures, the marking and description of evidence, analysis methods, documentation of observations, possible conclusions and standards for reaching those conclusions, report writing, peer review verification, technical and administrative review, instrument calibration and maintenance, and storage and return of evidence. Weller Decl. ¶¶ G2-G3, G9. Those procedures are reviewed and approved by the accrediting agency, and analysts undergo annual proficiency tests to ensure compliance. AFTE has published these standards for professional guidance and use, including the AFTE Training Manual (166-page document outlining all steps a new trainee should undertake prior to staring casework), the AFTE Technical Procedures Manual (116-page document providing technical procedures for typical examinations that may occur in firearms and toolmark identification laboratories), the AFTE Glossary (244-page document providing the profession with standardized terminology and definitions), and the AFTE Theory of Identification. *Id*.

Accordingly, this *Daubert* factor weighs in favor of admissibility. *U.S. v. Diaz*, No. CR 05-00167 WHA, 2007 WL 485967, at *10 (N.D. Cal. Feb. 12, 2007) ("This order holds that the SFPD Crime Lab standard and AFTE theory of identification are understood by the members of the field [and they] 'control' the technique as *Daubert* contemplates."); *U.S. v. Otero*, 849 F. Supp. 2d 425, 435 (D.N.J. 2012), *aff'd,* 557 F. App'x 146 (3d Cir. 2014) ("In sum, the Court concludes that the maintenance of industry-compliant standards by the [New Jersey State Police] for conducting a

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 21

firearms and toolmark identification examination, and the adherence to those standards and procedures by [the examiner], further support the reliability and therefore admissibility of the expert testimony.").

Despite these uniform standards, the defense focuses its argument on the subjective elements of firearm examination, and it is true that the discipline does not base its conclusions on purely objective criteria or pre-specified measurements. The 2016 PCAST Report noted this and concluded, quite sensibly, that it does not matter if there is a subjective element to the examiner's analysis, provided her conclusions are accurate, the field can achieve "scientific validity." PCAST Report, at 49-51. The black box studies demonstrate that examiners are extraordinarily accurate, regardless of whether they can describe their opinion in terms of micrometers or confidence intervals.

As numerous courts have held, this aspect of subjectivity is not fatal to admissibility, nor does it undermine the fact that this field is governed by a set of standards and controls. *Diaz*, 2007 WL 485967, at *10 ("Although the essential phrase—'sufficient correspondence'—could be construed as vague, this order finds it is not an unreasonable standard when used by a competent firearms examiner."); *Romero-Lobato*, 379 F. Supp. 3d at 1120 ("The mere fact that an expert's opinion is derived from subjective methodology does not render it unreliable.") (citing *Ashburn*, 88 F. Supp. 3d at 246-47); *Johnson*, 2019 WL 1130258, at *18 ("[T]he presence of a subjective element in a technical expert's field does not operate as an automatic bar to admissibility."). This aspect of subjectivity is also not unique to firearm identification. Medical and legal experts, for example, often cannot express their opinions in numerical measurements. That does not render

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 22

those opinions inherently unreliable, nor does is it mean that those fields are not governed by standards.

### E.    Firearms identification enjoys general acceptance in the scientific community.

The defense's assertion that firearm examination is not generally accepted in the scientific community is outdated, at best. Dr. Eric Lander, former Director of the White House Office of Science and Technology policy, was chosen by the President literally to speak on behalf of the scientific community regarding issues of national importance, and Dr. Lander has thought deeply about the validity of firearm examination as part of his leadership on the 2016 PCAST Report. In Dr. Lander's view, the field of firearm examination was "just short" of scientific validity in early 2018, while a "second study would solve this problem," provided it shared the "well-designed" structure of the Ames I study. *Lander*, 86 Fordham L. Rev. at 1672. This view was shared by Dr. Lander's many co-authors on the PCAST Report, a broad assemblage of luminaries from various scientific fields, who unanimously "reviewed and approved" the report. PCAST Report, at vii. As discussed above, the "problem" of "scientific validity" has now been solved (and then some), using exactly the methods that those third-party experts identified.

Furthermore, in the United States' view, this field did not need to wait for the blessing of Dr. Lander and PCAST for "general acceptance." Firearm identification is practiced by accredited laboratories in the United States and throughout the world, including England (Scotland Yard), New Zealand, Canada, South Africa, Australia, Germany, Sweden, Greece, Turkey, China, Mexico, Singapore, Malaysia, Belgium, Netherlands, and Denmark. *See* Weller Decl. ¶ G1. In the United States alone, there are 209 accredited firearm and toolmark laboratories, that often operate within a larger forensic laboratory providing chemistry, DNA, and fingerprint identification. *Id*. ¶

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 23

G4. And scientists from a variety of disciplines have authored studies in this area. *Id.* at ¶¶ G12-G13, Appendix A.

This is why, notwithstanding the few aberrant rulings cited in the defense's motion, virtually every court to address the question has found that firearm identification has gained general acceptance and satisfies this *Daubert* factor. *Romero-Lobato*, 379 F. Supp. 3d at 1122 ("[T]echniques do not need to have universal acceptance before they are allowed to be presented before a court.") (citing *Daubert*, 509 U.S. at 594 (this factor is intended to prohibit techniques with "only minimal support")); *Harris*, 502 F. Supp. 3d 28, 40 ("Even courts that have been critical of the validity of the discipline have conceded that it does enjoy general acceptance as a reliable methodology in the relevant scientific community of examiners."); *Johnson*, 2019 WL 1130258, at *19 ("There is no dispute here that toolmark identification analysis is a generally accepted method in the community of forensic scientists, and firearms examiners in particular.").

**F.    The relationship of the technique to methods which have been established to be reliable.**

This type of examination is, in some respects, akin to fingerprint analysis. In the context of fingerprint analysis, the Third Circuit has held that the evidence was properly admitted even though the level of agreement between prints was subject to some level of subjectivity. *See United States v. Mitchell*, 365 F.3d 215, 236 (3d Cir. 2004). As the Third Circuit did not hold that certain subjectivity there warranted excluding the evidence, the Court should similarly not exclude the evidence here.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 24

### G.    Rippman and Wells are qualified to testify based on the methodology.

Rippman has been employed as a Firearm and Toolmark Examiner with the federal Bureau

of Alcohol, Tobacco, Firearms and Explosives since January 2020.  ECF No. 542-2. Before that,

he was employed as a Firearm and Toolmark Examiner for the Georgia Bureau of Investigation

from February 2011 to 2019. *Id.* He has been a member of the Association of Firearms and

Toolmark Examiners ("AFTE") since 2016. *Id.* He has also completed numerous training courts

and continuing education. *See id.* at 1-2.

Wells has been employed as a Firearm and Toolmark Examiner with the federal Bureau of

Alcohol, Tobacco, Firearms and Explosives since July 2008, and has received firearms examiner

training. *See* ECF No. 543-2, at 1-2.  These individuals' qualifications to testify based on firearms

examination methodology is self-evident, and the defendant does not argue to the contrary.

### H.    Non-judicial uses of the method.

Firearms analysis has been put to non-judicial uses, such as administrative proceedings to

identify which security guard had fired his firearm. *But see United States v. Wrensford*, No. CR

2013-0003, 2014 WL 3715036, at *17 (D.V.I. July 28, 2014) ("The Court does not consider the

use of firearms examinations in such administrative proceedings as the kind of "non-judicial use"

contemplated by this *Daubert* factor.").

### VI.    <u>THERE IS NO NEED TO LIMIT THE TESTIMONY OF THE FIREARM EXAMINERS.</u>

Firearms identification meets all the *Daubert* criteria. Accordingly, there is no scientific or

legal basis to exclude this evidence or even limit it. The Court should allow the examiners to

describe the methods and steps they took in conducting their analysis; what they saw when they

*United States v. James, et al.*, Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 25

looked at the firearms evidence through the microscope; their observations of agreement (or disagreement) in the marks on the firearms evidence; and their opinions about whether the bullets or cartridges in question were fired from a particular firearm.

"[I]t is important to note that the courts that imposed limitations on firearm and toolmark expert testimony were the exception rather than the rule. Many courts have continued to allow unfettered testimony from firearm examiners who have utilized the AFTE method." *Romero-Lobato*, 379 F. Supp. 3d at 1117. Moreover, most courts who imposed limitations only limited the use of terms like "reasonable degree of ballistics certainty" or "to the exclusion of all other guns." *Ashburn*, 88 F. Supp. 3d at 249; *Willock*, 696 F. Supp. 2d at 582-82; *United States v. Green*, 405 F.Supp.2d 104, 124 (D. Mass. 2005); *but see United States v. Felix*, Crim. No. 2020-0002, 2022 WL 17250458 (D.V.I. 2022) (holding that DeSouza could testify regarding individual toolmarkings and use comparison photographs, but "not testify as to a match between cartridge cases and the recovered firearm"). Limitations of this sort are unnecessary here. In line with guidance from the Department of Justice, the firearms examiners in this case will refrain from expressing their identification in terms of absolute (100%) certainty and will not state or imply that the identification is being made to the exclusion of all other firearms in the world or that the firearms examiner's conclusions are held "to a reasonable degree of scientific certainty."[15] As such, there is simply no reason for this Court to impose limitations on the testimony of the examiners in this case.

---

[15] *See* Exhibit 3.

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 26

## VII.   THERE IS NO NEED TO CONDUCT A *DAUBERT* HEARING.

Nor is there any need to conduct a *Daubert* hearing. District courts enjoy broad discretion in exercising its gatekeeping function and deciding the admissibility of expert testimony.  *See United States v. Gatson*, 744 F. App'x 97, 101-02 (3d Cir. 2018).  Thus, the denial of a *Daubert* hearing is reviewed for abuse of discretion. *See id.* at 101. And trial courts routinely deny pretrial *Daubert* hearings on the reliability of firearm identification evidence. *See, e.g.*, *United States v. Pete*, No. 3:22CR48-TKW, 2023 WL 4928523, at *2 (N.D. Fla. July 21, 2023) ("FTI has long been accepted as a field worthy of expert testimony, and a *Daubert* hearing is not necessary for the Court to perform its "gatekeeping function" because the extensive evidence and argument submitted by the parties provide a more-than-adequate basis for the Court to evaluate the *Daubert* factors.");*United States v. Lee*, No. 19 C 641, 2022 WL 3586164, at *3 (N.D. Ill. Aug. 22, 2022) ("A *Daubert* hearing is not necessary. The Court has reviewed the parties' briefs, all cases relied on by the parties as well as other judicial decisions concerning the validity of toolmark analysis, and various reports and studies on the matter. These materials provide the Court with a thorough and well-documented record from which to rule. Accordingly, the request for a hearing on the motion is denied.").

Indeed, in the past few years, numerous federal courts have held *Daubert* hearings on exactly these arguments and concluded that they did not provide a basis to exclude or limit firearm examination testimony. *See, e.g., Romero-Lobato*, 379 F. Supp. 3d 1111; *Harris*, 502 F. Supp. 3d 28; *Johnson*, 2019WL 1130258; *see also Cerna*, 2010 WL 3448528, at *6 ("Indeed, the ACE-V method specifically has undergone *Daubert* analysis by a number of courts and has been repeatedly upheld as sufficiently reliable. A pretrial evidentiary hearing to re-plough ground already

*United States v. James, et al.,* Case No. 19-CR-00079
Opposition to Defendants' Motion to Limit the Testimony of the
Government's Proposed Expert Witnesses in Firearms Examination
Page 27

canvassed time and again is unnecessary, although the government will be required to introduce

reliability evidence at trial, as it has committed to do.") (citations omitted).

There is no need to convene yet another pretrial *Daubert* hearing on these issues. That is

particularly true because the passage of time and the release of additional studies have only

bolstered confidence in this field and further weakened the defendants' arguments.

## VII.   **CONCLUSION**

For all these reasons, the United States respectfully submits that the Court should deny the

defendants' motion without a Daubert hearing.

Respectfully submitted,

Dated: December 6, 2023                             s/ *Delia L. Smith*
                                                    Delia L. Smith
                                                    United States Attorney
                                                    District of the Virgin Islands
                                                    5500 Veteran's Drive, Suite 260
                                                    St. Thomas, VI 00802
                                                    Office: (340) 774-5757
                                                    Delia.Smith@usdoj.gov